## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TERRANCE JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:19-cv-00444-GCS** |
| | ) | |
| **JONATHAN DYE, KYLE HUGHEY,** | ) | |
| **ANTHONY WILLS, and ROB** | ) | |
| **JEFFREYS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 167). Defendants Jonathan Dye ("Dye") and Kyle Hughey ("Hughey") filed their Motion for Summary Judgment along with a Memorandum in Support on January 17, 2023. (Doc. 167, 168). In their Memorandum in Support, Defendants assert that they did not violate Plaintiff's constitutional rights under the First or Fifth Amendment through their investigation and issuance of a disciplinary report that implicated Plaintiff with tobacco trafficking. (Doc. 168). Plaintiff, Terrance Johnson ("Johnson") filed a Response in Opposition to the Defendants' Motion for Summary Judgment on January 24, 2023. (Doc. 170). For the reasons delineated below, the Court **DENIES** the Motion for Summary Judgment. (Doc. 167).

## PROCEDURAL BACKGROUND

Johnson is an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Hill Correctional Center ("Hill"). Johnson alleged deprivations of his constitutional rights arising from the issuance of an Inmate Disciplinary Report and a guilty verdict by the Adjustment Committee, which resulted in disciplinary segregation for his suspected involvement in trafficking tobacco at Menard Correctional Center ("Menard"). (Doc. 1). Under 28 U.S.C. § 1915A, the Court completed its preliminary review of Johnson's initial Complaint on August 8, 2019. (Doc. 14). The Court construed Johnson's allegations into the following counts:

> **Count 1:** First Amendment retaliation claim against Dye, Hughey, and Internal Affairs Supervisor John Doe for drafting a false disciplinary report and persuading another inmate to submit a fabricated statement against Plaintiff when he did not provide information in the tobacco trafficking investigation.

> **Count 2:** Fifth Amendment claim against Dye, Hughey, and Internal Affairs Supervisor John Doe for drafting a false disciplinary report and persuading another inmate to submit a fabricated statement against Plaintiff in an attempt to compel him to give self-incriminating information during the tobacco trafficking investigation.

> **Count 3:** Fourteenth Amendment procedural due process claim against Dye, Hughey, and Internal Affairs Supervisor John Doe for filing a false disciplinary report.

> **Count 4:** Fourteenth Amendment procedural due process claim against Brookman, Hart, and Lashbrook for disregarding constitutionally required procedures while conducting the disciplinary hearing.

> **Count 5:** Fourteenth Amendment due process claim against Wandro, Baldwin, and Benton for affirming the unconstitutional process used by the Adjustment Committee during Plaintiff's disciplinary hearing and upholding the retaliatory actions of Dye, Hughey, and Internal Affairs Supervisor John Doe.

*Id.* at p. 3-4. Counts 1 and 2 of Johnson's Complaint proceeded against Defendants Dye and Hughey but were dismissed without prejudice against John Doe Defendant. *Id.* at p. 5-6. Counts 3, 4 and 5 did not survive preliminary review and were dismissed without prejudice. *Id.* at p. 7-9. On August 25, 2021, Johnson amended his Complaint to include Anthony Wills and Rob Jeffreys[1] in their official capacities as Warden of Menard and Director of the IDOC respectively to effectuate any injunctive relief awarded by the Court. (Doc. 111, p. 2).

FACTUAL BACKGROUND

A.   **Defendants' Initial Investigation and Documents Produced in Connection with their Investigation**

On the evening of May 9, 2018, Menard Correctional Center Officer Nathan Smith ("Smith") discovered several bags of tobacco in Gallery 2 at Menard. (Doc. 170, Exh. 2, p. 9-10). After Smith recovered the tobacco, he released the tobacco to the Internal Affairs unit, wrote an incident report, and placed an incarcerated worker assigned to Gallery 2 – CI #1[2] – on "Investigative Status." (Doc. 170, Exh. 2, p. 2). In the Incident Report, Smith stated the following:

> [I] was performing a routine shakedown of all 2 gallery . . .  During this shakedown [I] discovered one large plastic glove of tobacco weighing 27.2 grams (verified by I.A. Dye) and 8 small individual bags in the gutter under the step to the yard door, at the front of the gallery. All contraband was

---

[1]   Rob Jeffreys is no longer the Director of the Illinois Department of Corrections. As such, the Court **DIRECTS** the Clerk of Court to substitute Latoya J. Hughes, who is currently the Acting Director of the IDOC.

[2]   CI #1 has two separate nickname aliases. For clarity, the Court notes that CI #1 is also known as "Nickname #1" and "Nickname #2" within the record.

secured . . . and released to I.A. Officer Dye. Chain of Command Notified.

*Id.* at p. 6. Defendants Dye and Hughey were then assigned to investigate and identify who was trafficking the tobacco and to determine whether any correctional center staff were involved. (Doc. 168, Exh. 1, p. 18:17-20); (Doc. 168, Exh. 2, p. 24:1-2).

As part of the investigation, Defendants Dye and Hughey interviewed CI #1 and CI #2. Defendants first interviewed CI #1 on May 9, 2018, at 9:25 pm. (Doc. 170, Exh. 2, p. 11). During the interview, CI #1 stated that CI #2[3] and Derrondas Reed[4] were responsible for trafficking tobacco at Menard and that CI #1 occasionally assisted Reed with the transport of the tobacco around the facility. *Id.* CI #1 further noted that CI #2 got the tobacco from upstairs and that Reed throws the tobacco down for CI #2 to "fish off the gallery." *Id.* In his deposition, CI #1 stated that Defendants Dye and Hughey made him feel as though they "wanted [him] to name Pooh (Reed) and Duck (Johnson)[5] during the investigation." (Doc. 168, Exh. 8, p. 11:6-9). CI #1 stated Dye and Hughey were "threatening [him]" if he did not name Reed or Duck as suspects. *Id.* at 14:21-24. Following the interview of CI #1, Dye sent an email at 10:47 pm that same day notifying the chain of command of his preliminary findings. (Doc. 170, Exh. 3, p. 10-11).

On May 10, 2018, Lt. Kalin Bridges ("Bridges") conducted targeted cell searches in the North Lower Cell House, including the cells of Reed and CI #2. (Doc. 170, Exh. 3, p. 8). Both Reed and CI #2 were searched, and no contraband was discovered. However, it

---

[3]     CI #2 is also known as "Nickname #3" in the record.

[4]     Derrondas Reed is also known as "Pooh."

[5]     Plaintiff, Terrance Johnson, is also known as "Duck."

was noted that Reed's "shakedown" revealed an "abundance of commissary items." *Id.* During the shakedown, Johnson and Reed (Johnson's cellmate) were interviewed. (Doc. 170, Exh. 3, p. 5). Both denied having any knowledge of tobacco in the North Lower Cellhouse. *Id.* After the shakedown concluded, Reed and Johnson were placed on "investigative status" and escorted to North 2 segregation. *Id.* Lt. Bridges then sent an email to Joshua Schoenbeck at 2:44 pm (copying Dye) to update him on the investigation's progress. *Id.*

Later that afternoon, Defendant Dye interviewed both Reed and CI #2 about the alleged tobacco trafficking. (Doc. 170, Exh. 3, p. 5). Dye first interviewed CI #2 at 4:00 pm. (Doc. 170, Exh. 2, p. 18-19). CI #2 stated that he had never purchased tobacco in the cellhouse, but he was aware of tobacco being present. *Id.* at p. 19. CI #2 also disclosed that he witnessed CI #1 selling tobacco and that CI #1 had previously informed CI #2 that he had obtained the tobacco from Reed. *Id.* After completing the interview with CI #2, Dye emailed his chain of command and relayed the information obtained from the interview. (Doc. 170, Exh. 3, p. 5). Dye also noted in the email that "[o]ffenders involved will be interviewed again in the coming days in an attempt to gain further information as to the original source of the tobacco before issuing disciplinary reports." *Id.* Dye then interviewed Reed at 8:20 pm. (Doc. 170, Exh. 2, p. 16-17). During the interview "Reed denie[d] having any . . . tobacco in the [North Lower] Cellhouse." *Id.* at p. 17.

Additional Confidential Informant interviews took place on May 12, 2018, and May 16, 2018. (Doc. 170, Exh. 2, p. 20- 23). The first unidentified Confidential Informant was interviewed on May 12, 2018, at 3:15 pm by Defendant Dye. (Doc. 170, Exh. 2, p. 20-

21). During the interview, the Confidential Informant reportedly stated that the movement of tobacco had slowed since the shakedown and that he had obtained information about where the tobacco was coming from. *Id.* at p. 21. The Confidential Informant indicated that "Duck and Pooh" had been trafficking tobacco and were "known as the tobacco guys in the cell house." *Id.* The second unidentified Confidential Informant interview was conducted by Correctional Officer McCarthy ("McCarthy") and took place on May 16, 2023, at 9:30 am. The Confidential Informant reportedly stated that "'Duck' Terrance Johnson . . . [was] known as the 'tobacco guy'" and that "Johnson works with 'Pooh' - Derrondas Reed" to traffic the tobacco *Id.* at p. 23.

After the May 16, 2018, interview concluded, McCarthy updated the chain of command on the continued progress of the investigation via email at 9:52 am. (Doc. 170, Exh. 2, p. 24). In the email, McCarthy stated that:

> [T]he CI confirmed that "Duck" Terrance JOHNSON R15112 is known as the "tobacco guy." Johnson works with "Pooh" Derrondas REED K90424. The CI claimed that Offender Reed has had a female staff "cuffed" here at Menard CC for years to the point that they may even have a relationship. REED is able to obtain weed, tobacco and ecstasy from the described staff member, claiming that ecstasy is sold for $30 a pill.

*Id.*

Johnson also testified that Dye and Hughey interviewed him on May 21 and May 24, 2018. (Doc. 169, p. 45:21-52:16). Both interviews took place in the protective custody room at Menard. *Id.* at p. 49:18-21. Regarding the May 21, 2018, interview, Johnson stated that Dye and Hughey inquired as to whether he knew about his cellmate's (Reed's) involvement in trafficking tobacco at Menard, if he had ever seen Reed with tobacco, if

he had any knowledge about how Reed had acquired the tobacco, and if a staff member had provided the tobacco to Reed. *Id.* at p. 46:20-24. In response to Hughey's and Dye's questioning, Johnson responded that he "had no knowledge of [Reed's involvement.]" *Id.* at p. 48:5-10.

Johnson reported that the May 24th interview proceeded in a similar manner but noted that Hughey and Dye "were more amped up" about him giving them information about Reed and any staff involvement. (Doc. 169, p. 47:5-11). Johnson testified that Dye and Hughey were "agitated" with him for not providing them with any information, and they yelled at him due to his unsatisfactory responses. *Id.* at p. 49:22-51:9. After Johnson again indicated that he had no knowledge of any tobacco trafficking at Menard, Dye reportedly told Johnson that he had "fucked" himself, and because Johnson could not "help" them, they could not "help" him. *Id.* at p. 49:22-51:9. Dye also purportedly told Johnson that he would "make sure that [Johnson] did at least a year of segregation" for failing to cooperate. *Id.* at p. 51:22-52:16.

## B.    Dye's and Hughey's Decision to Charge Johnson

Around 9:45 pm on May 24, 2018, Defendant Hughey signed and served a disciplinary ticket on Johnson. (Doc. 170, Exh. 2, p. 26). The ticket charged Johnson with violations of Menard rules, as well as state and federal law including - "103 – Bribery and Extortion; 110 - Impeding or Interfering with an Investigation; 203 - Drugs and Drug Paraphernalia, and 501 - Violating State or Federal Law." *Id.* As the lead officers of the investigation, both Dye and Hughey made the decision to draft the charging document and to serve it on Johnson. *See, e.g.*, (Doc. 168, Exh. 1, p. 30:9-15) (stating that "[m]yself

and Lieutenant Hughey did the investigation and deemed at the end of the investigation we had enough information to author disciplinary reports."). The ticket accused Johnson of trafficking tobacco at Menard and charged him with violating the four departmental rules noted above, stating in relevant part:

> The Investigations Unit met with a Confidential Informant . . . that stated he had pertinent information regarding the tobacco being discovered. The CI stated he was close to offender JOHNSON and knew he was one of the offenders trafficking the tobacco. The CI stated JOHNSON and another offender . . . have been running tobacco for a while and are known as the "tobacco guys." Prior to the tobacco being discovered a second Confidential Source . . . had turned over multiple bags of tobacco that he had obtained from offender JOHNSON.

(Doc. 170, Exh. 2, p. 26).

The Investigation Report also noted that disciplinary tickets were issued to CI #1 and Reed in connection with the trafficked tobacco. (Doc. 170, Exh. 2, p. 25, 27). CI #1's ticket was issued by Defendant Dye at 8:30 pm on May 24, 2018. *Id.* at p. 25. CI #1 was charged with "103 - Bribery and Extortion; 203 - Drugs and Drug Paraphernalia, 406 - Trading or Trafficking, and 501 – Violating State or Federal Law." *Id.* Reed's ticket was served by Defendant Dye at 9:00 pm on May 24, 2018. *Id.* at p. 27. Reed was charged with the same offenses as Johnson. *Id.*

During his deposition, Defendant Dye elaborated on how he and Defendant Hughey made the decision to issue Johnson a disciplinary ticket. (Doc. 168, Exh. 1, p. 30:14-15). Dye stated that he and Hughey charged Johnson based on statements from three different informants: CI #1, CI # 2 and the May 12th informant. *Id.* at p. 26:3-8; 35: 19-22. However, neither CI #1's interview sheet nor CI #2's interview sheet indicated that

either confidential informant named Johnson as being responsible for trafficking tobacco. (Doc. 170, Exh. 2, p. 12-13, 19). Numerous Menard Officers, including Lt. Joshua Schoenbeck and Lt. Bridges, indicated that these discrepancies were concerning. Lt. Schoenbeck testified that all formal interviews should be documented with an interview sheet, and all interview sheets were required to be included in the investigative report. (Doc. 168, Exh. 4, p. 59:21 – 60:1). Lt Bridges specifically testified that he would have expected a subsequent interview of CI #2.

**C.      Deposition Testimony of the Three Informants**

Johnson's counsel deposed the three informants, CI #1, CI #2, and the May 12th informant, who served as a basis for Dye's and Hughey's decision to issue a disciplinary ticket to Johnson. (Doc. 168, Exh. 8, 9, 10).

CI #1 testified that he never implicated Johnson as being responsible for the trafficking tobacco during the May 9th interview. (Doc. 168, Exh. 8, p. 11:2-15). Specifically, CI #1 stated the following:

Q. Did Mr. Dye and Mr. Hughey ask you about [CI# 2] and Pooh [Reed]?

**A.** Yeah. Yes.

Q. And that's—that's during the May 9 interrogation; is that right?

**A.** Yes.

Q. Did they ask you about somebody named Duck during the May 9 interrogation?

**A.** At that point, I don't believe they did. I don't think so.

Q. Did you ever identify someone named Duck as responsible for

trafficking tobacco in this investigation?

   **A.** No.

*Id.* at p. 24:2-15. CI #1 also indicated that he felt pressure to say that CI #2 and Reed were

involved in trafficking tobacco. *Id.* at p. 24:16-20.

   CI #2 testified that he had only informed Officer Dye that CI #1 had sold tobacco

on the gallery and that CI #1 gets that tobacco from Reed. (Doc. 168, Exh. 9, p. 16:3-19).

   CI #3 was deposed on January 20, 2022, after the Court ordered that Defendant

Anthony Wills ("Wills") reveal the identities of the May 12th and May 16th informants.[6]

(Doc. 168, Exh. 10). CI #3 testified that Dye and Hughey interrogated him about the

tobacco found in the facility because his cell was positioned in an area where he could

see the tobacco that was uncovered on the evening of May 9, 2018. *Id.* at p. 11:11-12:24,

16:3-23. CI #3 also testified that he told the officers that he saw the tobacco on the gallery

from his cell; however, he did not provide Hughey or Dye with any names because he

"didn't know who was trafficking it." *Id.* at p. 15:19-22.

**D.   Johnson's Sentence to Administrative Segregation and Resulting Injuries**

   On June 5, 2018, the IDOC Adjustment Committee found Johnson guilty of

committing the four offenses charged by Dye and Hughey. (Doc. 170, Exh. 6, p. 2). The

Committee provided the following explanation for its decision:

   Based on the observation of the reporting employee an investigation was
   initiated on 5/9/18 and was called to the north lower cell house upon the

---

[6]      The Court ordered Mr. Wills to identify both the May 12th informant as well as the May
16th informant. However, Mr. Wills lacked "information or knowledge related to the identity" of
the May 16th informant. (Doc. 170, Exh. 8, p. 2-3). No other officer involved in the deposition could
recall the identity of the May 16th informant, including McCarthy who purportedly interviewed
the informant.

discovery of 27.2g of tobacco on 2 gallery. Cell house staff turned over 8 small bags and one large bag of tobacco that were found under the gutter leading out to the PC yard. The investigations unit met with CI whose name and number are being withheld for the safety and security of the institution that stated he had pertinent information regarding the tobacco being discovered. The CI stated he was close to offender Johnson and knew he was one of the offenders trafficking the tobacco. The CI stated that Johnson and another offender whose name and number are being withheld for the safety and security of the institution have been running tobacco for a while and are known as the tobacco guys. Prior to the tobacco being discovered a second Confidential sources, whose name and number are being withheld for the safety and security of the institution had turned over multiple bags of tobacco that he had obtained from offender Johnson. Inmate ID by offender 360 and state ID card Committee finds inmate guilty based on information provided and accepts the written report to be factual account of the incident and is satisfied the violations occurred as reported.

The adjustment committee finds the information provided by the confidential source to be reliable based upon verification from Intel Officer.

The internal investigation revealed that inmate Johnson R15112 self-admitted to giving and receiving money for trafficking tobacco.

*Id.* In accordance with its determination, the Adjustment Committee sentenced Johnson to four months of "C Grade" status, four months of commissary restriction, six months of contact visits restriction and four months in segregation. *Id.*

Johnson reportedly suffered numerous physical and emotional injuries during his time in segregation. (Doc. 169). Particularly, Johnson testified that he had to deal with "[r]unning and burning eyes, [a] running nose, coughing, sneezing, [and] choking" when officers used pepper spray to break up frequent fights in the segregation cell block. *Id.* at p. 112:8-13. Johnson also reported passing out because he was not removed from his cell or provided with protective equipment when a feed box was being welded to his cell door. *Id.* at p.113:21-114:2, 114:8-13. Further, Johnson contracted athletes' foot, suffered

from a lack of sleep, and lost a significant amount of weight while he was in segregation. *Id.* at p. 115:23-116:17; 116:25-117:19; 118:8-16. As to his emotional injuries, Johnson testified that he experienced considerable anxiety, irritability, and depression while he was in held in segregation and that he still feels this emotional impact to date. *Id.* at p. 119:3-120:22, 121:15-19.

Dr. Keramet Reiter, an Associate Professor in the Department of Criminology, Law and Society at the University of California, Irvine, provided the Court with a report indicating that Johnson's experiences in segregation, including his physical and resulting emotional damages are consistent with the known effects of administrative segregation and entirely foreseeable when an individual is placed in such conditions. (Doc. 170, Exh. 10, p. 12-13).

## LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants*, *Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

*See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences.") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary

judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

DISCUSSION

**A.      Johnson's Fifth Amendment Claim**

Defendants move for summary judgment on Johnson's Fifth Amendment claim on two grounds. (Doc. 168, p. 20-23). First, Defendants assert that Johnson's Fifth Amendment rights were not implicated as no criminal case was pending against him during or after the May 2018 trafficking tobacco investigation. *Id.* Second, Defendants assert that Johnson failed to present any evidence of retaliation for the statements Johnson made during the investigation. *Id.* at p. 23. Johnson contests Defendants' arguments on a legal basis – asserting that an individual's Fifth Amendment rights can be implicated "even if there [are] no pending criminal cases against the individual." (Doc. 170, p. 31 - 32). The Court agrees with Johnson's position as a matter of law and finds there is sufficient evidence in the record to allege a Fifth Amendment retaliation claim against Defendants Dye and Hughey.

The Fifth Amendment, which is applicable to the states through the Fourteenth Amendment, protects an individual against self-incrimination by prohibiting the government from using an assertion of the right to silence in a criminal proceeding against them. However, Fifth Amendment protections extend beyond criminal prosecutions to include "other proceeding[s], civil or criminal, formal or informal, where the answers might incriminate [the person] in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (citing *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924)). This

extension is in line with the object of the Amendment, the purpose of which "'was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.'" *Lefkowitz*, 414 U.S. at p. 77 (quoting *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892) (overruled on other grounds by *Kastigar v. United States*, 406 U.S. 441 (1972)).

Defendants argue that the outcome of Johnson's Fifth Amendment claim is controlled by the case of *Baxter v. Palmigiano*, 425 U.S. 308 (1976). (Doc. 168, p. 22). In *Baxter*, the Court considered whether drawing an adverse inference from Fifth Amendment silence in a civil proceeding imposed too high of a cost on the exercise of the Fifth Amendment privilege. *See Baxter*, 425 U.S. at 316-320. There, a prison inmate (Palmigiano) had been brought before a prison disciplinary board on charges of inciting a disturbance. *Id.* at p. 312. Palmigiano was informed that state criminal charges might also be brought against him and was advised that he could remain silent at the disciplinary proceeding but that this silence "would be held against him" in that proceeding. *Id.* At the disciplinary hearing, Palmigiano was confronted with incriminating evidence and chose to remain silent. Thereafter, the Board placed Palmigiano in segregation for 30 days and downgraded his institutional status. *Id.* at p. 313, 317. Ultimately, the Court in *Baxter* concluded that an adverse inference based on silence was appropriate when additional incriminating evidence had also been presented. *Id.* at p. 318. The additional evidence against Palmigiano was plentiful. The Court, however, clarified that a direct inference of guilt from silence alone was forbidden in instances where additional evidence of guilt, separate from an individual's silence, was

not available. *Id.*

Like *Baxter*, Defendants note that no criminal proceedings are or were pending against Johnson in relation to the disciplinary ticket he received on May 24, 2018. Defendants believe this fact is the necessary trigger for the Fifth Amendment to apply to Johnson's case. However, Johnson correctly notes that this is not the crux of determining whether his Fifth Amendment rights were implicated. Rather, the Fifth Amendment is implicated where there exists a mere possibility that a criminal case *could have* been filed in the face of Johnson's silence, where no other evidence of his guilt existed. In such circumstances, the improper use of an individual's silence can be viewed as a basis for retaliation.

This exact distinction was noted by the Seventh Circuit in *Vermillion v. Levenhagen*, No., 14-2327, 604 Fed. Appx. 508, 509-512 (7th Cir. Mar. 5, 2015). *Vermillion* concerned an inmate who alleged that investigators at an Indiana state prison retaliated against him for failing to answer their questions about escaped inmates. The inmate alleged that he was placed in administrative segregation and documents were falsified to "exaggerate his security classification." *Vermillion,* 604 Fed. Appx. at 512. The Seventh Circuit noted that the Fifth Amendment right applies "in the prison disciplinary context, and prison officials may violate a prisoner's right against self-incrimination if a prisoner's silence alone results in punishment of the kind compelling waiver of the right." *Id.* This ultimately allowed the court to conclude that Vermillion "plausibly allege[d] . . . that [Defendants] were involved in retaliating against him for his refusal to talk to the Internal Affairs Investigators." *Id.*

The circumstances in this case are similar to *Vermillion*. Johnson refused to identify any inmates who were trafficking tobacco at Menard during the May 21st and May 24th interviews because he was not aware of any relevant information. (Doc. 141, Exh. 1, p. 45:21-52:16). Later that same day, he was issued a disciplinary ticket identical to that of Reed. However, the justification provided by Dye and Hughey for issuing that ticket to Johnson is inconsistent with the documentary evidence from the investigation they conducted. Most notably, neither CI #1's interview sheet nor CI #2's interview sheet indicates that Johnson was implicated for trafficking tobacco at Menard. (Doc. 170, Exh. 2, p. 12-13, 19). Additionally, CI #3 (the May 12th Informant) testified during his deposition that he did not provide Hughey or Dye with any names because he "didn't know who was trafficking it." (Doc. 168, Exh. 10, p. 15:19-22). Yet, Defendant Dye stated that he and Hughey charged Johnson based on statements from these three informants. (Doc. 168, Exh. 1, p. 26: 3-8; 35: 19-22). In light of this record, the Court believes that a reasonable jury could conclude that Defendants Hughey and Dye lacked any evidence to implicate Johnson in the tobacco trafficking, and he was retaliated against for refusing to provide information. Therefore, Johnson's Fifth Amendment claim will be allowed to proceed to trial.

**B.    Johnson's First Amendment Claim**

A successful claim for First Amendment retaliation requires that a plaintiff show, "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment Activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to

take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). "Once the Plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant . . . to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct." *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). Defendants argue that Johnson has failed to meet the second and third prongs of the test. (Doc. 168, p. 25-32). Johnson, however, asserts that he has met all three prongs. (Doc. 170, p. 18- 31). Upon reviewing the record in the light most favorable to Johnson, the Court finds that Johnson has pointed to sufficient evidence in the record to create a material dispute of fact regarding the disputed prongs of the required test. Thus, summary judgment as to Johnson's First Amendment claim is denied.

### 1.   *Johnson's Protected First Amendment Activity*

To make a *prima facie* case, Johnson must first show "that he engaged in an activity protected by the First Amendment." *Bridges*, 557 F.3d at 546. Defendants do not dispute this first element. (Doc. 168, p. 25). Indeed, the Court notes that Johnson had a First Amendment right to truthfully answer the questions that Defendants Hughey and Dye posed to him about tobacco trafficking at Menard. *See, e.g., Mckinley v. Schoenbeck*, No. 17-1709, 731 Fed. Appx. 511, 514 (7th Cir. April 17, 2018) (noting that "[t]ruthfully answering questions during an investigation, even if those answers are not what the officers wanted to hear," is protected speech); *see also Bridges*, 557 F.3d at 551. Johnson testified that he was telling the truth when he told Defendants that he had no information to provide them

to assist with their investigation. (Doc. 170, Exh. 2, p. 48:5-10, 71:8-72:4). Thus, the Court finds that the first prong of Johnson's claim is satisfied.

### 2. Johnson Suffered a Deprivation that would likely deter First Amendment Activity in the Future

The second prong of the test requires a plaintiff to show "that he suffered a deprivation that would likely deter First Amendment activity in the future." *Bridges*, 557 F. 3d at 546. Here, Defendants put forward two arguments as to why they are entitled to summary judgment. First, they argue that the disciplinary action was imposed by the Adjustment Committee, and as such, Defendants cannot be held responsible for Johnson's alleged constitutional deprivation. (Doc. 168, p. 25). Defendants next assert that Johnson has not suffered a sufficient deprivation that would likely deter First Amendment activity. (Doc 168, p. 26). The Court will address each of the Defendants' arguments in turn.

As to Defendants' first argument, Defendants note that "the Adjustment Committee made a recommendation for discipline based on the investigation that was completed" by Defendants. (Doc. 168, p. 25-26). Further, they state that the "defendants were not on the Adjustment Committee and did not recommend the disciplinary action of Plaintiff" nor "did [they] provide an opinion or input into the disciplinary action [against] Plaintiff." *Id.* Additionally, Defendants indicate that they "did not threaten Plaintiff with disciplinary action if [he] did not wish to provide a statement." *Id.* Defendants believe these facts relieve them from liability. However, Johnson's account of events differs significantly from Defendants.

The record indicates that Defendants did, in fact, provide input into the disciplinary proceeding, as it was the ticket issued by Defendants Dye and Hughey that triggered the disciplinary hearing. Based on Defendants' investigatory findings, the Adjustment Committee then determined Johnson's punishment. The committee relied on the report drafted by Dye and Hughey in its decision making. Had the ticket by Dye and Hughey not been issued at the conclusion of their investigation, Johnson would not have suffered any adverse consequences in relation to the trafficking tobacco incident. Further, Johnson asserts that the Defendants did indeed threaten him with disciplinary action if he did not provide a statement about the tobacco trafficking. Johnson specifically recounted in his deposition that Defendant Dye purportedly told him that he would "make sure that [Johnson] did at least a year of segregation" for failing to cooperate. (Doc. 169, p. 51:22-52:16). Thus, Defendants factual argument clearly fails.

Additionally, Johnson correctly points to Seventh Circuit precedent that negates Defendants' legal argument on this point. The Seventh Circuit has indicated that an officer who retaliates against a plaintiff by serving a disciplinary ticket, which causes the plaintiff to be placed in segregation or suffer other deprivations, can be sued under Section 1983. *See, e.g.*, *Thomas v. Anderson*, 912 F.3d 971, 975 (7th Cir. 2018) (overturning judgment as a matter of law in favor of defendants – Anderson and Cochran – who allegedly drafted and served a disciplinary ticket on plaintiff, where plaintiff presented evidence that defendants had a retaliatory motive for serving the ticket); *Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006) (upholding a jury verdict for plaintiff on First Amendment retaliation claim against prison social worker who wrote and served

disciplinary ticket on plaintiff). Accordingly, Defendants' argument that liability can be avoided due to their degree of separation from the decision makers who actually imposed Johnson's punishment is misplaced.

Defendants next argue that "Plaintiff's assertions of his lost job after the issuance of the disciplinary ticket, and time in segregation are not deprivations that would likely deter First Amendment activity in the future." (Doc. 168, p. 26). Defendants assert that "a prisoner's liberty interests are limited to freedom from restraint which 'impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life,' or to actions which 'inevitably affect the duration of a [a prisoner's] sentence.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 487 (1995)). Defendants then cite to additional authority from the Eighth Circuit concerning Due Process Clause protections to support this argument. *See, e.g., Portley-El v. Brill*, 288 F.3d 1063, 1065-66 (8th Cir. 2002) (holding that thirty days in punitive segregation was not an atypical and significant hardship under *Sandin*). However, Johnson correctly notes there is a lower standard of deprivation required under a First Amendment retaliation claim as compared to a Due Process Clause claim. Thus, Defendants' argument here also fails because they misstate the applicable standard of law.

To determine whether a defendant's actions would deter First Amendment activity, the Court must apply a test, asking only "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in [the] protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). The standard is objective, such that a specific plaintiff's persistence does not undermine his claim. Cf.

*Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (observing that the standard "does not hinge on the personal experience of the plaintiff"). In contrast, protections under the Due Process Clause are triggered only where the freedom of restraint exercised exceeds a prisoner's sentence in an unexpected manner or imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *See Sandin*, 515 U.S. at p. 484.[7] Given these distinct inquiries, the Court cannot impose the Due Process Clause standard, as suggested by Defendants, with respect to Johnson's First Amendment retaliation claim.

Applying the appropriate standard stated above, the Court finds that Johnson has provided evidence that deprivations, like those he experienced, would be sufficient to deter a prisoner of ordinary firmness from engaging in a protected First Amendment activity. This determination is in line with pre-existing Seventh Circuit case law. Notably, the Seventh Circuit has indicated that denial of a prison job that would impart palpable benefits could deter First Amendment activity. *See, e.g., McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005) (noting that taking away a prisoner's job could amount to a constitutional deprivation); *Dewalt v. Carter*, 224 F.3d 607, 618-619 (7th Cir 2000) (holding that job removal stated retaliation claim), abrogated on other grounds by *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (en banc). The Seventh Circuit also recently

---

[7]     The Court in *Sandin* noted that "[p]risoners retain other protection from arbitrary state action even within the expected conditions of confinement." Particularly, the Court noted that prisoners may pursue actions under the First and Eighth Amendments as well as the Equal Protection Clause. This suggests the Court recognized the distinction between the differing applicable standards of deprivation in their own analysis. *See Sandin v. Conner*, 515 U.S. 472, 487 n.11 (1995).

determined that just six days of disciplinary segregation was a serious enough deprivation to deter the exercise of a prisoner's First Amendment rights. *See, e.g.*, *Whitfield v. Spiller*, 76 F.4th 698, 708 (7th Cir. 2023) (stating that "Whitfield's first six days of disciplinary segregation qualify as a serious enough deprivation to deter the exercise of First Amendment rights."). Here, Johnson alleges that he lost his job as a janitor/porter because of the disciplinary actions taken by the Adjustment Committee. Johnson also alleges that he was placed in segregation for a four-month period. Such allegations meet or exceed the standard of deprivation as illustrated by existing Seventh Circuit precedent.

### 3.    *Johnson's First Amendment Activity was 'at least a motivating factor' in the Defendants' Decision to take the Retaliatory Action*

Lastly, Defendants argue summary judgment should be granted because Johnson has failed to meet the third prong of the First Amendment retaliation test – *i.e.*, that Johnson must show "the protected First Amendment activity was the reason Defendants acted." (Doc. 168, p. 27). Defendants assert that Johnson cannot meet this prong as he has "failed to show that Defendants retaliated against him for failing to provide a statement [for the tobacco trafficking investigation]." *Id.* In response, Johnson points to evidence in the record to suggest that Defendants' decision to pursue disciplinary action against him was at least, in part, motivated by the fact that he refused to provide Defendants with the information they desired regarding the investigation. (Doc. 170, p. 23). Specifically, Johnson points to Defendant Hughey's and Dye's threatening statements towards him during the May 2018 interrogations, as well as the timing and composition of the disciplinary ticket, to suggest retaliatory animus. The Court finds that the divergent

accounts created by Defendants' and Johnson's review of the record warrant consideration by a jury.

The Seventh Circuit has held that threats from defendant correctional officers and subsequent punishment of an inmate constitute evidence of a retaliatory motive sufficient to defeat a motion for summary judgment. For example, the Seventh Circuit found that an officer's statement to a plaintiff stating that he "shouldn't have been making complaints about the prison 'if he did not want to be in a situation like this one'" was sufficient evidence of a retaliatory motive where the plaintiff was later assigned to one month of segregation. *See Thomas*, 912 F.3d at 974-976. The court deemed other statements towards the plaintiff as sufficiently indicative of retaliatory motive. Such statements included: "[y]ou should have thought about that before you made all [your] complaints about me and filing grievances in the prison" and "[I] [don't] like inmates who tried to get staff in trouble." *Id.* at 976. More recently and consistent with *Thomas*, the Seventh Circuit determined that an officer's statement to an inmate plaintiff that he could be his "best friend or wors[t] nightmare" was indicative of retaliatory motive. *McKinley*, 731 Fed. Appx. at 513.

The statements reportedly directed at Johnson by Defendants Dye and Hughey are arguably as or more severe than those evaluated by the Seventh Circuit in *Thomas* and *McKinley*. Here, Johnson testified that during his May 24th interview, both Defendants were "agitated" and yelled at him for failing to provide the information they sought. (Doc. 169, p. 47:12-21). Johnson further testified that Defendant Dye told him that he had "fucked" himself by failing to provide them with any information, and that because

Johnson could not "help" them, they could not "help him." *Id.* at 49:22-51:9. Defendant Dye also reportedly told Johnson that "he would make sure that [Johnson] did at least a year of segregation." *Id.* at 51:22-52:16. These statements alone are sufficient for a reasonable jury to conclude that the Defendants harbored retaliatory motive.

However, Johnson also points to the suspect timing and composition of the disciplinary ticket as an indication of retaliatory intent. The Seventh Circuit has held that such evidence can create a triable issue on the motivations of defendants in First Amendment retaliation cases. In *Greene v. Doruff,* the Seventh Circuit reversed a district court's grant of summary judgment for the defendants due to the short amount of time between the adverse action taken against the plaintiff and the issuance of a "threadbare" conduct report in the case. 660 F.3d 975, 980 (7ᵗʰ Cir. 2011). There, the plaintiff reported that he had told a prison librarian about a grievance he had filed against the defendant officer just one day before the officer filed a conduct report against the inmate plaintiff. However, the plaintiff had filed that grievance against the officer one month prior for firing him as a clerk in the prison library allegedly without cause. *Id.* at p. 976. The Seventh Circuit concluded that "the timing of [the defendant's] action, if we credit the plaintiff's testimony (as we must on this record) that he told the librarian about his grievance the day before [defendant] filed the conduct report, together with the rather threadbare nature of the report was sufficient . . . to create a triable issue." *Id.*

A comparable timeline of events has unfolded in the present case. Initially, Johnson was only interviewed for information about the tobacco trafficking because his cellmate Reed had been implicated by confidential informants. Johnson then repeatedly

told investigators that he was aware of no information about the trafficking of tobacco. The record reflects that Hughey served Johnson with the disciplinary ticket on the same day (May 24th) that Defendants Dye and Hughey had threatened him. Moreover, the ticket was identical – down to the typographical errors - to the ticket that was served on Reed, even though the record reflects there is substantially different evidence supporting the charges against the two inmates. Together, this evidence could lead a reasonable jury to conclude that Defendants Dye and Hughey served the ticket on Johnson in retaliation for not providing any information regarding the tobacco trafficking.

### 4.    *Defendant's Burden to Demonstrate Non-Retaliatory Motive*

Because the Court has concluded that the evidence is sufficient to establish a *prima facie* case of retaliation, Defendants Dye and Hughey have the burden to show they would have taken the same disciplinary action "in absence of the protected speech." *Zellner v. Herrick*, 639 F.3d 371, 378-379 (7th Cir. 2011). If they satisfy that burden, Johnson must then present evidence from which a jury could "infer the defendant's proffered reason is a lie" or "pretext." *Id.* at 379. On this point, Defendants assert that there is "overwhelming evidence [which] shows the ticket issued to Johnson was based on a totality of evidence from the investigation conducted." (Doc. 168, p. 27). Johnson, however, believes that "the evidence adduced during discovery suggests the proffered non-retaliatory justification is pretext." (Doc. 170, p. 25). The Court agrees with Johnson that the evidence contained in the record could lead a reasonable jury to believe that Defendants' reasons for acting were pretextual.

The only argument advanced by the Defendants to establish their non-retaliatory

motive is that an abundance of evidence existed to charge Johnson with tobacco trafficking. (Doc. 168, p. 27-31). Defendants recount each phase of the investigatory process undertaken by correctional officers at Menard to show that the appropriate and proper steps were taken. *Id.* However, Johnson notes that the primary evidence relied upon by Defendants to issue the disciplinary ticket was questionable at best. For example, CI #1, CI #2, and CI #3 testified under oath that they did not identify Johnson as responsible for trafficking tobacco to any officer at Menard. (Doc. 170, p. 29). Defendants note that CI #1 testified that he had implicated Johnson. However, during CI #1's deposition, he indicated that he had only implicated CI #2 and Reed. CI #1 recalled that only Reed and Johnson had been put in administrative segregation, which caused him to mistakenly believe they were the two inmates he had identified. *Id.* Further, CI #2 stated in his deposition that he only implicated CI #1 and Reed. CI #3 (the May 12th Informant) stated that he did not name any specific individuals in his interview with Defendants Dye and Hughey. These facts directly contradict Dye's and Hughey's testimony that they relied upon CI #1, CI #2 and the May 12th Informant when deciding to pursue disciplinary action against Johnson. This alone creates a material dispute of fact regarding the basis of Dye's and Hughey's decision to pursue disciplinary action against Johnson. As such, summary judgment is precluded.

However, Defendants also assert that Defendants Dye and Hughey relied on Johnson's trust fund account statements as justification for pursuing disciplinary action. (Doc. 168, p. 31). During his deposition, Defendant Dye stated that "at least one of the highlighted entries" indicated on Johnson's May 8, 2018, matched one of the entries on

Reed's trust fund summary from the same date. (Doc. 168, Exh. 11). Defendant Dye also stated that based on his prior highlights and notations of "13 different people" that these summaries were used as support in his and Hughey's decision to issue Johnson the May 24th disciplinary ticket. *Id.* However, Johnson notes that the investigation report makes no mention of the summaries, despite testimony from multiple officers that all relevant information supporting the disciplinary action should have been included in the report. (Doc. 170, p. 25); *see generally*, (Doc. 168, Exh. 2). This factual dispute likewise precludes the entry of summary judgment against Johnson.

C.     **Defendants' Qualified Immunity**

Defendants argue they are shielded from liability due to qualified immunity. (Doc. 168, p. 32-33). Qualified immunity shields government officials who are performing discretionary functions from civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Johnson contends that Defendants cannot be shielded by qualified immunity as he has clearly established that his First and Fifth Amendment rights were implicated. (Doc. 170, p. 33). The Court agrees with Johnson.

To determine whether an official is entitled to qualified immunity, a two-part analysis must be undertaken: (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable official that his conduct was unlawful in the situation he confronted. *Id.* at 202. However, an official who makes a reasonable mistake as to what the law requires is entitled to the defense of qualified immunity. *Id.* at 205.

Based on the facts alleged, the Court believes that Johnson has clearly stated claims against the Defendants for First and Fifth Amendment violations. *See, e.g.*, *Antoine v. Ramos*, No. 11-1807, 497 Fed. Appx. 631, 634 (7th Cir. Dec. 5, 2012) (reversing summary judgment and finding that disciplinary ticket which was alleged to be "fabricated in retaliation for engaging in protected speech" was properly within the scope of a Section 1983 suit.). Moreover, no credible argument can be advanced that the Defendants were not aware of a clearly established right on behalf of Johnson to be protected against retaliation and the imposition of punishment based on a false disciplinary ticket. While the Defendants may claim there was a reasonable mistake based on their investigation, the facts interpreted in the light most favorable to Johnson clearly belie that assertion. The Defendants did not appear to have any evidence connecting Johnson to the trafficking of tobacco. The threats made by Defendants Dye and Hughey to Johnson during his interrogation further reinforce the notion that the disciplinary ticket was, in fact, fabricated and imposed in retaliation for Johnson's failure to cooperate. The Court is thus not convinced that the actions of Defendants amounted to a reasonable mistake. Accordingly, the Court cannot allow them to be shielded by qualified immunity.

**D.    Johnson's Requested Injunctive Relief Against Defendants Jeffreys and Wills**

Defendants contest Johnson's requested injunctive relief against Defendants Wills and Jeffreys because Defendants Hughey and Dye "acted within their duties and took

lawful action" when they issued the disciplinary ticket to Johnson. (Doc. 168, p. 33-34). Johnson, however, asserts that "injunctive relief from public officials when the officials act outside their authority or unlawfully" is available. (Doc. 170, p. 34) (citing *Illinois Federation of Teachers v. Board of Trustees, Teachers' Retirement System*, 548 N.E.2d 64, 66 (Ill. Ct. App. 4th Dist. 1990)). As discussed above, there is sufficient evidence for a reasonable jury to conclude that Defendants Dye and Hughey acted unlawfully by retaliating against Johnson for the exercise of his First and Fifth Amendment Rights. Additionally, Defendants Wills and Jeffreys are the proper parties to effectuate such relief. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Thus, the Court will allow Johnson to pursue injunctive relief as a remedy.

## CONCLUSION

For the reasons detailed herein, the Court **DENIES** Defendant's Motion for Summary Judgment. (Doc. 167, 168). A status conference will be set by separate docket text order to discuss the setting of a trial date.

**IT IS SO ORDERED.**

**DATED:  September 29, 2023.**

Digitally signed by Judge Sison
Date: 2023.09.29 10:48:50 -05'00'

_____

**GILBERT C. SISON**
**United States Magistrate Judge**